COURT OF APPEALS OF VIRGINIA


Present:   Judges Frank, Petty and Senior Judge Bumgardner
Argued at Richmond, Virginia


DANIEL PETER MOLLOY

v.        Record No. 2552-05-3

ABBEYSHROUL, INC. AND
  HARLEYSVILLE MUTUAL
  INSURANCE COMPANY                         MEMORANDUM OPINION* BY
                                            JUDGE RUDOLPH BUMGARDNER, III
HARLEYSVILLE MUTUAL                              JULY 18, 2006
  INSURANCE COMPANY

v.        Record No. 2606-05-3

DANIEL PETER MOLLOY


            FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

            Richard L. McGarry for Daniel Peter Molloy.

            Michael F. Blair (Tracey Alice Berry; Penn, Stuart & Eskridge, on
            briefs), for Harleysville Mutual Insurance Company.

            No brief or argument for Abbeyshroul, Inc.


      Daniel Peter Molloy appeals a decision of the Workers' Compensation Commission

denying his claim for benefits and medical expenses related to his injury by accident.  The

claimant contends the commission erred in finding that an independent intervening cause

attributable to his own intentional conduct caused the amputation of his right arm.[1]  On

---

      * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

      [1] While claimant presents three questions in his brief, all three questions relate to the
commission's finding that he failed to prove the right arm ischemia and subsequent amputation
constituted a compensable consequence of his February 10, 2004 injury by accident.  We address
those questions as they relate to that one issue.

cross-appeal, Harleysville Mutual Insurance Company contends the commission erred in finding an injury by accident arising out of and in the course of his employment and in denying its motion to reopen the record for additional testimony. We conclude that credible evidence supports the commission's decision and affirm. Accordingly, we need not address the issues raised on cross-appeal.[2]

We view the evidence in the light most favorable to the prevailing party below. R.G. Moore Bldg. Corp. v. Mullins, 10 Va. App. 211, 212, 390 S.E.2d 788, 788 (1990). The claimant was a general manager of Freddy's Sunset Grill. On the evening of February 9, 2004, he had an after-hours meeting with his dining room manager at the restaurant. By the time the meeting ended, it was around 1:30 a.m., on February 10, 2004. As the claimant exited the restaurant from a side door, he slipped on an icy step and hurt his right arm.

The claimant drove to the emergency room, but left before being treated even though he believed his arm was broken because he thought the emergency room was too crowded. He went home, wrapped his arm with ice in a towel, changed his clothes for bed, and took two Percocet[3] that Dr. Gregory Riebel had previously prescribed for him for a back and neck injury. Thirty to forty-five minutes later, the claimant took two more Percocet and went to bed.

Between 3:30 a.m. and 4:00 a.m., the claimant got out of bed because his arm was swollen and painful. He unsuccessfully tried to call his girlfriend. He stated that the pain worsened and he became lightheaded "like [he] was going to pass out and [he didn't] remember exactly what happened." He believed he was "out" for three to four hours. When he awoke around 8:00 a.m., he was "foggy" and his arm was "worse." He described his condition:

---

[2] Abbeyshroul, Inc., the employer, did not participate in the appeal before the full commission.

[3] The commission noted, "Percocet is a brand name for a narcotic analgesic that is used to treat moderate to moderately severe pain."

I picked my arms up my fingers went down to my elbow and my palm was resting on my forearm and prior to this it was probably the worst pain I've ever experienced, but at this point I thought I was dying and I had, on the surface of my skin I was getting different types of like red dots coming to the surface and exploding and just fading out.

He described his hand as being "completely dead." He made several calls, and at some point, his daughter arrived and drove him to the hospital, followed by an ambulance that had responded to the claimant's 911 call.

The claimant admitted that he took ten Percocet over the twenty-four-hour period before he entered the hospital. He took six Percocet before the meeting that night and four after he arrived home.[4] Each Percocet was ten milligrams. The claimant also admitted that pursuant to Dr. Riebel's February 3, 2004 prescription for the Percocet, the most recent prescription obtained by the claimant, the maximum recommended dosage was one pill every eight hours. However, the claimant asserted that he was told he could take one to two Percocet every four to six hours as needed for pain.

The hospital emergency department triage notes indicated the claimant "appears drugged," has "slow slurred speech," and "trouble staying awake." Those notes also listed the claimant's current medications as Valium and Percocet and that he denied injury. The Emergency Physician Report indicated that the claimant took "valium 10 mg and percocet 10 mg this AM," and there was no recent injury. The claimant denied remembering anything about what he told the medical personnel about the accident or his injury when he arrived at the hospital.

Dr. Laurie King, the emergency room physician who examined the claimant, noted that the claimant was seen in the emergency room two days earlier, and since then had increasing

---

[4] A Pre-Anesthesia Evaluation form dated February 10, 2004 indicated that claimant "took 10 percocet today." That form also indicated claimant complained of "sev. arm pain, but drops off to sleep v. easily."

right shoulder to arm pain with decreased ability to move the arm and decreased sensation. She also recorded that the claimant "took valium 10 mg and percocet 10 mg this AM." Dr. King checked the box "no" under whether there was a "recent injury," but noted that the claimant said he "lifted heavy pot 2 [days] ago." Dr. King noted that the claimant "falls asleep easily when not stimulated." She assessed ischemia of the right upper extremity. The claimant was admitted to the hospital.

Dr. William Z. H'Doubler examined the claimant February 10, 2004. Dr. H'Doubler noted that over the past twenty-four hours the claimant developed increasing pain in his right arm. He noted that the claimant "takes a lot of oral analgesics, as well as Percocet, etc., and he took a lot of these at home." Dr. H'Doubler indicated that the claimant presented to the emergency room with a "profoundly ischemic right hand." Dr. H'Doubler noted that the claimant "had end stage ischemic changes in the hand with insensate with no motor function and with flexion contracture in the fingers." He diagnosed "[a]cute onset of right upper extremity ischemia, which is profound," and "high risk of limb loss."

Dr. Andrew Roth, a plastic surgeon who consulted on the claimant's case at Dr. H'Doubler's request on February 10, 2004, noted, "the prognosis is bleak for limb salvage below the elbow." On February 12, 2004, Dr. Roth wrote, "prolonged compression of [right upper extremity]" was the "most likely" etiology of the claimant's condition.

Dr. Vashist V. Nobbee examined the claimant on February 10, 2004. In a February 12, 2004 report, Dr. Nobbee noted that the claimant reported he fell previously and developed significant trauma to his right forearm. Dr. Nobbee indicated that the claimant immediately noticed discoloration, which progressed to significant pain and discoloration. Dr. Nobbee opined "[c]ertainly, the recent trauma may account for the disruption of the arterial flow with evidence of thrombosis. However, embolic phenomena remain a concern."

- 4 -

Dr. Brian Torre examined the claimant February 11, 2004. Dr. Torre noted that the claimant sustained "an embolic phenomenon that actually has been going on apparently for quite some time intermittently." Dr. Torre indicated that four days before the claimant's admission, "he started to have severe episodes of pain and cramping in his right arm but presented to the emergency room 2/10/04 with obvious complete ischemia of upper extremity." Dr. Torre noted that massive clots were removed and fasciotomies performed.

Dr. H'Doubler attempted vascular repair, but on February 14, 2004 Dr. Bertram Spetzler amputated the claimant's arm because of continued ischemia and then gangrene.

In a March 19, 2004 discharge summary, Dr. Nobbee recorded that the claimant had fallen two weeks prior to admission and suffered significant and extensive right upper limb trauma but sought no treatment. Dr. Nobbee indicated that the claimant's acute arterial occlusion of the distal forearm was thought to be related to this trauma, but studies, including MRA and TEE, excluded potential embolic sources for the occlusion.

Dr. Steven G. Harris, a plastic surgeon, who testified in a post-hearing deposition, treated the claimant for burns in 1999, and again in February 2004, after the amputation of the claimant's arm. Dr. Harris testified that the claimant told him he had fallen, that his arm hurt after the fall, and that he went to the emergency room after trying to take care of himself. The claimant told Dr. Harris that as a result of the fall, he had lost circulation in his arm, and he had to have it amputated. The claimant told Dr. Harris that he was on a lot of pain medicine and he remembered seeing that his arm was black and in "awful condition" in the emergency room. Eventually, Dr. Harris referred the claimant to University of Virginia (UVA) for treatment. In describing the event to Dr. Drake at UVA, Dr. Harris stated as follows:

> I told him that [the claimant] had lost the circulation to his
> arm, probably from compression, that he had been involved in a
> fall, had taken pain medication in an effort to try to make the pain

- 5 -

better, had been in one position for a period of time afterwards and lost the circulation to his arm.

There had been a delay in him coming to the emergency room following that episode, and by the time he got to the emergency room, his arm was not salvageable. In the operating room they did fasciotomies. The vascular surgeon tried to revascularize arm, never got good flow reestablished to the hand and forearm, and he ended up needing the amputation.

Dr. Harris agreed that taking medication and falling asleep on one's arm was "certainly one of the explanations that could explain this phenomenon, this fairly unusual phenomenon." When asked if taking ten Percocet, ten milligrams each, within a twenty-four-hour period, four of them within a forty-five-minute period, would make the claimant somewhat comatose, Dr. Harris acknowledged that as a plastic surgeon, he did not know the pharmacology of Percocet. Dr. Harris opined a person's reaction to Percocet would be dependent upon body weight and narcotics tolerance. Dr. Harris did not know how much Percocet would affect the claimant, but he said that taking four Percocet in a forty-five-minute period is dangerous due to its Tylenol content.

Dr. Harris opined that the claimant "developed compartment syndrome after relatively minor trauma." Dr. Harris did not believe that the claimant suffered from an embolism that traveled from another part of his body to his arm. Dr. Harris opined that the claimant had a loss of blood flow to his arm, and he offered the following opinion:

I think he had a minor injury, he took pain medicine, he was asleep for a long period of time, he woke up, his arm was black and had obviously had the circulation cut off, and I think it's fair to say that some combination of the minor injury and a period of immobility together produced irreversible tissue death in his forearm.

Dr. Harris did not believe that for a person "who had some experience with narcotics," ten Percocet distributed over a twenty-four-hour period would be enough to put that person into a profound sleep. However, Dr. Harris opined that a person would have to have "some fairly

- 6 -

profound pharmacologic or toxic agent on board to sleep through the kind of pain that we are talking about before you ever get to the black and grossly swollen stage." When asked whether he had an opinion to a reasonable degree of medical certainty as to why the claimant passed out and what caused the period of immobility, Dr. Harris opined that "[t]he record leaves you with the impression that it was too much pain medicine, and I don't know of anything else that was turned up during any of his workup or anything else that would lead you to any other conclusion." Dr. Harris agreed "the most likely culprit is too much pain medication." He explained as follows:

> [T]he pain medicine . . . decreases your awareness of pain . . . [and] makes you sleepy, [and] that's a pretty good fit for being in a position, one position and not moving.
>
> Your arm begins to hurt, but because you are out of it and the particular reason that you are out of it is you have a bunch of pain medicine on board, it allows you to stay in that terrible position for much longer than you would ordinarily do if this pain medicine was not in your system.

Dr. Harris concluded that in his opinion "the fall was the event that led to this sequence of events that culminated in the amputation of [the claimant's] arm." He opined that it would take at least three to four hours of compression for the claimant's arm to turn black, it's not something that happens in fifteen or twenty minutes.

In answering a questionnaire provided to him by the claimant's counsel, Dr. Harris indicated that he did not "believe this is a case of arterial embolism." Dr. Harris opined that it was more likely than not that the degree of uninterrupted compression was a direct cause of the thrombi that necessitated the claimant's amputation. Dr. Harris agreed that unconsciousness after the fall, with the arm underneath the chest for four to six hours, could cause blood stasis in that area.

Dr. Harris disagreed that "a fall on an outstretched [hyper-extended] hand, landing on a top, icy landing, with the patient's buttocks landing three brick steps down, and thus, his forearm and upper arm striking the edge of the landing and step below, cause[d] an embolic episode which then caused arterial blockage." Dr. Harris explained, "without significant artherosclerosis (hardening), the arterial wall would not be stiff enough to 'crack' when struck in this way. The elasticity of the arterial wall would make this mechanism of injury *very* unlikely. Prolonged compression is much more likely." (Emphasis in original.)

Based upon this record, a majority of the commission found that while the claimant proved he sustained an injury by accident arising out of and in the course of his employment on February 10, 2004, he failed to prove that the ischemia and subsequent amputation of his right arm constituted a compensable consequence of that industrial accident. The majority found as follows:

> [T]he claimant's self-medicating by consuming medication that was not prescribed for this injury, and in a quantity that far surpassed the recommended dosage, broke the chain of causation between the industrial accident and the amputation. Therefore, the amputation was not a compensable consequence of the industrial accident—claimant lost his arm because he fell asleep on it after taking ten Percocet.

The majority relied upon the opinions of Drs. Roth and Harris as to the cause of the amputation. The majority found that the claimant "by taking more than three times the recommended dosage, acted willfully and intentionally. He reasonably should have known that this excessive abuse of prescribed medication could be expected to result in injury." The majority concluded:

> The event that led to the amputation of the claimant's arm was the result of an independent intervening cause attributable to the claimant's own intentional misconduct. The claimant improperly took medication, and this broke the chain of causation between the

original injury, the fall on the steps, and the subsequent consequence, amputation of the claimant's arm.

We agree.[5]

Factual findings made by the commission will be upheld on appeal if supported by credible evidence. See James v. Capitol Steel Constr. Co., 8 Va. App. 512, 515, 382 S.E.2d 487, 488 (1989). "We likewise defer to the commission's 'conclusions upon conflicting inferences legitimately drawn from proven facts' – for inferences, like historic facts, are likewise 'equally binding on appeal.'" Berglund Chevrolet, Inc. v. Landrum, 43 Va. App. 742, 750, 601 S.E.2d 693, 697 (2004) (quoting Watkins v. Halco Eng'g, Inc., 225 Va. 97, 101, 300 S.E.2d 761, 763 (1983)) (other citations omitted). Moreover, unless we can say as a matter of law that the claimant's evidence sustained his burden of proof, the commission's findings are binding and conclusive upon us. See Tomko v. Michael's Plastering Co., 210 Va. 697, 699, 173 S.E.2d 833, 835 (1970).

In Berglund, we discussed the doctrine of compensable consequences recognizing the following:

> The doctrine . . . attempts, in a single phrase, to summarize the attenuation limits of causation in workers' compensation law. "The simplest application of this principle is the rule that all the medical consequences and *sequelae* that flow from the primary injury are compensable." Virginia courts have often used just this description, as has the commission.
>
> Where such a causal link exists, "the doctrine of compensable consequences extends the coverage of the Workers' Compensation Act to the subsequent injury because the subsequent

---

[5] We recognize, as pointed out by claimant in his brief, that the commission on one occasion in its opinion used the phrase "intentional misconduct." However, it is clear from the totality of the commission's opinion and its recitation of the law of compensable consequences that the commission properly analyzed the claim in the context of that doctrine to determine whether claimant's conduct constituted an independent intervening cause attributable to his own intentional conduct. As the claimant conceded at oral argument "intentional conduct" is sufficient to break the chain of causation. Bartholow Drywall v. Hill, 12 Va. App. 790, 794, 601 S.E.2d 1, 3 (1991). It need not be "intentional *mis*conduct."

injury 'is treated as if it occurred in the course of and arising out of the employee's employment.'" The doctrine applies "when the injury does not arise on the day of the accident, but instead develops as a direct consequence of an initial injury."

The doctrine has its limits, however. "The link of causation must *directly connect* the original accidental injury with the additional injury for which compensation is sought." In other words, the issue is "essentially one of whether the medical evidence proves a causal connection between the primary injury and the subsequent occurrence." "The issue in all of these cases is exclusively the medical issue of causal connection between the primary injury and the subsequent medical complications. By the same token, denials of compensation in this category have invariably been the result of a conclusion that the requisite medical causal connection did not exist."

Berglund, 43 Va. App. at 750-51, 601 S.E.2d at 697 (citations omitted).

The commission's factual finding that the claimant consumed an excessive amount of narcotic pain medication to the point of causing him to pass out is supported by credible evidence, including the claimant's testimony, the medical records, and Dr. Harris's deposition testimony. Therefore, we are bound by that finding on appeal. Moreover, credible medical evidence, including the opinions of Drs. Roth and Harris, supports the commission's finding that as a result of passing out, compression of the claimant's arm took place over an extended period of time, which ultimately resulted in the amputation of his arm.

Under [the] doctrine [of compensable consequences], . . . "'[w]hen the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury likewise arises out of the employment, unless it is the result of an independent intervening cause attributable to claimant's own intentional conduct.'"

Farmington Country Club, Inc. v. Marshall, 47 Va. App. 15, 22-23, 622 S.E.2d 233, 237 (2005) (quoting Imperial Trash Serv. v. Dotson, 18 Va. App. 600, 606-07, 445 S.E.2d 716, 720 (1994)) (other citation omitted).

In this case, credible evidence supports the commission's conclusion that the claimant's own intentional conduct in taking an excessive amount of narcotic pain medication not prescribed for his injury caused the ischemia that led to subsequent amputation of his right arm. Dr. Harris opined that the most likely cause of the claimant passing out and falling asleep on his arm for a lengthy period of time was his taking an excessive amount of pain medication. Because credible evidence supports the commission's decision that the claimant's intentional conduct broke the chain of causation from the original injury, we cannot find as a matter of law that the claimant's evidence proved the ischemia and subsequent amputation of his right arm constituted a compensable consequence of his original injury.

For these reasons, we affirm the commission's decision.

<u>Affirmed.</u>